**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**STATESVILLE DIVISION**
**CIVIL ACTION NO.: 5:04CV156**

| | | |
|---|---|---|
| **EQUAL EMPLOYMENT** | ) | |
| **OPPORTUNITY COMMISSION,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **ORDER** |
| | ) | |
| **BUD FOODS, LLC d/b/a SHONEY'S** | ) | |
| **RESTAURANT,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

**THIS MATTER** is before the Court on Defendant's Motion for Summary Judgment and Brief in Support of Defendant's Motion for Summary Judgment, filed February 21, 2006. On March 10, 2006, Plaintiff filed its Memorandum in Opposition to Defendant's Motion for Summary Judgment. On March 27, 2006, Defendant filed its Reply Brief in Support of Defendant's Motion for Summary Judgment. On April 3, 2006, Plaintiff filed a "Surreply Brief in Opposition to Defendant's Reply Brief in Support of Defendant's Motion for Summary Judgment." On April 12, 2006, Defendant filed "Suggestion of Subsequently Decided Authority in Support of Defendant's Motion for Summary Judgment." This Motion is now ripe for disposition by the Court.

Having carefully considered the arguments, the record, and the applicable authority, for the below-stated reasons the Court will grant Defendant's Motion for Summary Judgment.

## I. FACTUAL AND PROCEDURAL HISTORY

For purposes of this Motion for Summary Judgment, the Court accepts the following facts

taken in the light most favorable to Plaintiff as true.  *See Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986).

**A.       Background and Operations of Bud Foods, LLC**

Defendant Bud Foods, LLC ("Defendant" or "Bud Foods") is a North Carolina limited liability company, which operates various Shoney's Restaurants pursuant to a franchise agreement with Shoney's Inc.  (30(b)(6) Dep. pp. 25, 179; Faust II Dep. pp. 16-17).  In 2003, Bud Foods operated six Shoney's Restaurants in North Carolina.[1]  (30(b)(6) Dep. p. 37).  These restaurants were located in Conover, Lenoir, Statesville, Salisbury, Concord, and Charlotte. ( *Id.*).

In March 2003, with only thirty (30) to thirty-five (35) employees, the Statesville Shoney's Restaurant was short of help and disorganized.  (Faust II Dep. pp. 42-43).  During that time, five individuals had an ownership interest in Bud Foods.  ( 30(b)(6) Dep. pp. 28-29).  Tracy Faust, III ("Faust Junior") owned forty-one percent (41%) of Bud Foods.  (*Id.*).  Faust Junior was the Chief Operating Officer of Bud Foods and was responsible for the overall operation of the six Shoney's Restaurants.  (*Id.* pp. 35, 39).  Henry Faust owned forty percent (40%) and worked in maintenance and construction.  (*Id.* pp. 28-29, 35).  Richard Santorum ("Santorum") owned nine percent (9%) of Bud Foods and was area supervisor for the Shoney's Restaurants located in Conover, Lenoir, and Statesville.  (Santorum Dep. pp. 9, 11; 30(b)(6) Dep. pp. 28-29, 35).  In addition to his duties as area supervisor, due to the absence of a manager at the Statesville location, in addition to his regular duties as area manager, Santorum was acting general manager

---

[1]The Court focuses on the operations of Bud Foods in 2003 because Plaintiff's claims arise from conduct that allegedly occurred from on or about March 20, 2003 through April 1, 2003. (Pohoski Dep. Exh. 12).

2

of the Statesville Shoney's and David Hodge ("Hodge") was working as a manager trainee with Santorum.  (Santorum Dep. p. 37; Hodge Dep. p. 10).  Denise Carman ("Carman") owned six percent (6%) of Bud Foods, and was employed as an office manager for Flo Foods, LLC ("Flo Foods"), which is a separate business entity from Bud Foods. (30(b)(6) Dep. p. 28-29; Carman Dep. pp. 10-12).  Carman was responsible for providing administrative services to Bud Foods, for which Bud Foods compensated Flo Foods on an hourly basis.  (Carman Dep. pp. 11-12). Finally, Tracy Faust, II ("Faust Senior") owned four percent (4%) of Bud Foods and spent approximately thirty-five percent (35%) of his time working for Bud Foods in 2003. (30(b)(6) Dep. pp. 28-29; Faust II Dep. p. 14).  Faust Senior would study Bud Foods' profit and loss statements and advise the Company based on these statements. (Faust II Dep. p. 15).  Faust Senior also spent a significant amount of time in 2003 assisting in the reorganization of Shoney's, Inc.  ( *Id.* pp. 15-16).  Moreover, Faust Senior assisted at the various Shoney's Restaurants owned by Bud Foods by cooking, washing dishes, and helping in operations. (30(b)(6) Dep. p. 36).

**B.     Sonia Pohoski's Employment with Bud Foods, LLC**

On March 5, 2003, Sonia Pohoski ("Pohoski") applied for employment at the Statesville Shoney's Restaurant.[2] (Pohoski Dep. pp. 14-22).  As acting manager of the Statesville Shoney's, Santorum interviewed Pohoski and subsequently offered her a server position. ( *Id.* pp. 18-19, 24-25).

Prior to beginning work at the Shoney's Restaurant in Statesville, Pohoski was required

---

[2]In 1997-1998, Pohoski had worked as a server at the Statesville Shoney's.  (Pohoski Depo. pp. 11-12; 73-74). However, at that time the restaurant was owned by Shoney's of Nashville.  ( *Id.* ).

to watch training videotapes, which lasted about two to three hours, and covered the various job responsibilities at the restaurant and safety procedures, as well as a prohibition against sexual harassment. (Pohoski Dep. pp. 32-39; Faust III Declaration ¶ 4). Pohoski was also required to review and sign various Company policies, including a Sexual Harassment Policy. (Pohoski Dep. pp. 45-52; Exhs. 3, 4).

Pohoski first reported for work at the Statesville Shoney's on March 20, 2003, and worked portions of March 20, 21, 22, 23, 24, 25, 26, 28, 29, 30, and April 1, 2003. (Faust III Decl. ¶ 3, Exh. A).

## C.    Sexual Harassment

While working those eleven days at the Statesville Shoney's, Pohoski alleges that she was subjected to sexual harassment by Faust Senior (Pohoski Dep. p. 144). Specifically, on her second or third day of work, Faust Senior called Pohoski over to the cash register and said, "Come here, let's talk about sex." ( *Id.* pp. 144-46). Pohoski did not respond to Faust Senior but instead just walked away. ( *Id.* p. 147). Later that same day, while Pohoski was walking down the server aisle and Faust Senior was walking behind her, Faust Senior quietly said something about Pohoski's rear end.[3] ( *Id.* pp. 149-50). Pohoski ignored the comment and acted as if she had not heard it. ( *Id.* p. 150). Then, a day or two later, before lunch time, Faust Senior called Pohoski over to the cash register and said, "The last time I had a girl your size, she wore the hair off of my dick." ( *Id.* pp. 152-53). Pohoski was embarrassed and "sort of didn't know how to take [the comment]." ( *Id.* p. 154). So, she told Faust Senior, "I don't, you know, appreciate

---

[3]At the time of her deposition, Pohoski could not recall Faust Senior's comment. (Pohoski Dep. pp. 149-50). Pohoski just recalled that he said something about her rear end. (*Id.*).

being talked to in a way like that" and she walked away.  ( *Id.* p. 155).  Later that same day, after clocking out, Pohoski was leaning on the cash register counter waiting to collect her tips and Faust Senior leaned over the register, looked at her rear end, and said "Mmm, mmm, mmm." ( *Id.* pp. 170-72).  Pohoski didn't say anything to Faust Senior; instead she collected her tips and left.  ( *Id.* p. 172).

Two days later, Faust Senior called Pohoski over to the cash register and started talking to her.  ( *Id.* p. 174).  Initially it was just a general conversation but at some point Faust Senior said, "I can't fuck you real good because my dick is like this size [indicating with fingers], but I can eat your pussy." ( *Id.* pp. 175-76).  Pohoski told Faust Senior, "You're sick or crazy or something" and walked away.  ( *Id.* p. 177).  Then, one to three days after this incident, Faust Senior told Pohoski that she needed to work more nights with him if she wanted job security. ( *Id.* p. 180).  Pohoski took Faust Senior's remark to mean that if she wanted to keep her job, she needed to have sex with him.  ( *Id.* p. 185).  Pohoski does not remember saying anything in response, but instead she went back to work.  ( *Id.* pp. 184-85).

In addition to these comments, Pohoski alleges that she overheard a conversation between co-workers about purported sexual harassment charges brought against Faust Senior and a few minutes later she heard Faust Senior say "something to the fact that 'I've got the power and the money to do what I want to do to who I want to do it to.'" ( *Id.* p. 187).  Pohoski does not know whether Faust Senior was present when the comments were made about the purported sexual harassment charges.  ( *Id.* pp. 189).  Additionally, on at least two or three occasions when Pohoski would come out of the unisex bathroom at the restaurant, Faust Senior would be standing outside the bathroom and comment that he had been looking for her. ( *Id.* pp. 191-92).

Pohoski further noticed that when she was cleaning her work area at the end of a shift, Faust Senior was frequently present and it made her "uncomfortable." ( *Id.* pp. 192-93). According to Pohoski, Faust Senior often called her "Poho." ( *Id.* p. 152). Moreover, while working at the Statesville Shoney's, Pohoski observed Faust Senior approach a server named Tabitha, who was carrying a serving tray in front of her, and press the edge of the tray into her breasts. ( *Id.* p. 158). Pohoski does not know what Tabitha and Faust Senior may have been discussing at the time and Pohoski does not recall what her co-worker later said to her about the incident. ( *Id.* pp. 159-60).

As a result of this alleged sexual harassment, about a week into her employment, Pohoski told Hodge, a manager trainee at the Statesville Shoney's, some of the sexual comments that Faust Senior had made to her. ( *Id.* pp. 200-01). Pohoski told Hodge that she did not appreciate Faust Senior calling her "Poho" all the time and that other people were complaining about sexual comments being made to them by Faust Senior ( *Id.* ). Pohoski felt she could talk to Hodge because "he was just a manager; he wasn't related or any part of the business." ( *Id.* p. 200). However, a manager trainee is not considered a manager, and their managerial responsibilities are generally limited to unlocking the door to the restaurant, putting money in the register, creating a prep list, and taking inventory. (Faust II Dep. pp. 45-46). Specifically with regard to Hodge, as a manager trainee, he assisted in cooking the food and counted the money in the morning. (Hodge Dep. p. 10). Hodge did not have the ability to hire, fire or discipline employees, he could not grant time off to employees, and he did not make out employee schedules. ( *Id.* pp. 41-42). When Pohoski asked Hodge what she could do about Faust Senior, Hodge told her, "You know, that's a pretty hard thing to do. You pretty much have to have a witness to be able to do anything like that." ( *Id.* p. 28). Hodge does not recall reporting

Pohoski's complaints to anyone else at Bud Foods. ( *Id.*).  Moreover, Hodge was the only individual to whom Pohoski complained about Faust Senior's sexual harassment. (Pohoski Dep. p. 205).

As a result of Faust Senior's alleged sexual harassment, Pohoski was depressed.  ( *Id.* p. 194).  She would "get up every day, . . . go home everyday and just about crying everyday and upset." ( *Id.*).  She would wake up not wanting to go to work but she needed a job.  ( *Id.* p. 195). She felt humiliated and stressed.  ( *Id.*).

**D.**     **Bud Food's Sexual Harassment Policy**

In March 2003, when Pohoski was hired as a server at the Statesville Shoney's Restaurant, the Company had an established Sexual Harassment Policy in place.  ( *Id.* p. 52). Bud Food's Sexual Harassment Policy provides in pertinent part as follows:

> *Bud Foods, LLC, strongly opposes and prohibits sexual harassment of its employees.  Sexual harassment includes sexual advances, requests for sexual favors and other physical conduct of a sexual nature when (a) submission or rejection is made either explicitly or implicitly a term or condition of employment or a basis for employment decisions; (b) such conduct has the purpose or effect of creating an intimidating, hostile, humiliating or sexually offensive work environment.  In addition, sexually oriented jokes and language, display or sexually oriented cartoons and pictures, and use of certain gestures can create a sexually offensive work environment and are prohibited.*
> *Any employee who believes that he or she is the victim of sexual harassment should bring this fact to the attention of Denise Carman (telephone number: 704-527-1745).  Denise Carman or her designee, will assist the employee in preparing a written statement of facts which will be the basis for an investigation of the alleged harassment, on a confidential basis; however, it may be necessary in the course of the investigation to disclose the facts and the name of the complainant to alleged witnesses and the alleged harasser, all of whom will be instructed to maintain confidentiality.  Denise Carman will report the results of her investigation to the complainant at the conclusion of the investigation.  Any employee found to have sexually harassed another employee will be subject to discipline, up to and including immediate discharge.  Bud Foods, LLC will not permit retaliation against any employee because that employee has participated*

*in the filing or investigation of a complaint of sexual harassment.*

It is the responsibility of each member of the management team of Bud Foods, LLC to insure compliance with the foregoing Sexual Harassment policy. If any member of the management team knows or has any reason to suspect any conduct which is or which could be construed as sexual harassment, he/she must take steps to investigate such activity within the framework of the Sexual Harassment Policy. Any employee of Bud Foods, LLC, including managers and supervisors, who is found (after investigation) to have engaged in sexual harassment, will be subject to immediate disciplinary action, up to and including termination of employment.

( *Id.* Exh. 4).

At the time she was hired to work at the Statesville Shoney's, Pohoski signed the Sexual Harassment Policy, indicating that she had "read and underst[ood] the Sexual Harassment policy and agree[d] to comply fully with this policy." ( *Id.* p. 55, Exh. 4). Although Pohoski remembers signing the Sexual Harassment Policy, she did not read the Policy because "basic sexual harassment policy is about the same anywhere. So, I'd done watched the video; I didn't see no need to read line for line. . . . Sexual harassment policies are basic, you know, what you're not supposed to say or what nobody's not supposed to do or whatever. So that's why it's basic information that I felt there was no reason to read every [line]." ( *Id.* pp. 52-53, 56). Pohoski was not provided a personal copy of the Sexual Harassment Policy, nor did she request a copy of the Policy. ( *Id.* p. 53). However, a copy of the Policy was posted on the bulletin board in the breakroom used by the Statesville Shoney's employees. (Santorum Dep. pp. 21-22; 30(b)(6) Dep. pp. 56, 61-63, 165).

In addition to signing the acknowledgment that she reviewed Bud Foods' Sexual Harassment Policy, Pohoski admits that she was required to watch a series of videos during her orientation, which included information regarding the Company's prohibition against sexual

harassment. (Pohoski Dep. pp. 56). Pohoski further stated that from watching the video, she understood that Shoney's was saying that sexual harassment was not tolerated in their stores and that employees were encouraged to complain about sexual harassment if it occurred. ( *Id.* p. 57).

**E.     Pohoski's Last Day of Employment With Bud Foods**

On April 1, 2003, Pohoski fell and hurt herself while trying to get the attention of a co-worker to let her into the restaurant. ( *Id.* p. 98, 101-03). Once in the restaurant, Pohoski reported her injuries to Hodge, who advised her to sit down and have a cup of coffee while she waited for Faust Junior to arrive, at which time she could talk to him about the incident. ( *Id.* pp. 104-05). Once Faust Junior arrived, Pohoski reported her injuries and asked Faust Junior for permission to leave and see a doctor. ( *Id.* pp. 108-09). Faust Junior told Pohoski, "You don't need to go to no doctor. You'll be all right, so just get back to work. You don't need to go to no hospital and get no drugs." ( *Id.* p. 109). Pohoski went back to work because she "liked working at Shoney's before, and [she] planned on staying there." ( *Id.* p. 114).

Later that day, Hodge resigned from working at Shoney's. ( *Id.* p. 117). As a result, the Statesville Shoney's was short-handed, so Faust Junior called Faust Senior and asked for his help. ( *Id.*). Faust Senior arrived a short time later and started helping on the cook line. ( *Id.* p. 118). Since Hodge quit in the middle of the lunch rush, the kitchen was backed up and customers were waiting to receive their food. ( *Id.*). Moreover, the servers were busy and behind on getting food to the customers. ( *Id.* p. 122). While in the midst of the lunch rush, Faust Senior reprimanded Pohoski and her co-worker for talking to another server. ( *Id.* p. 119). A few minutes later, Faust Senior yelled out to the servers, "You fucking bitches, get this GD [or God Damned] food out of the window." ( *Id.* p. 122-23).

After Faust Senior made this statement, Pohoski said, "That's it. I'm quitting. I'm taking care of my customers, I'm cleaning my tables, and I'm getting the hell out of here." ( *Id.* pp. 124-25). Faust Senior then approached Pohoski and asked her if she was upset. ( *Id.* pp. 125-26). Pohoski responded, "I'm past upset. Upset is not even a word for what I am right now." ( *Id.* p. 126). Faust Junior then told Pohoski, "If you are quitting, you need to get the hell out of my restaurant." ( *Id.* p. 127). Pohoski responded, "I'll get the hell out of your restaurant when I get my tips." ( *Id.*). As she was leaving, Pohoski loudly announced, "'That's it. I'm through. I've had enough. I've took all of the sexual harassment. I've took all of the not having breaks. I've took all of the talked to like you're a dog. I've took treated like you're going to steal food off the bar because you didn't get a break all day.' And if you'd get a piece of bacon or something and eat it real quick, you were pretty much accused of stealing food or whatever. . . . 'I've had enough of everything. . . . This is the most ridiculous thing I've ever seen for a restaurant, and I've worked at plenty of them in my life.'" ( *Id.* p. 127-28). Pohoski then left the restaurant and did not return to work at the Statesville Shoney's. ( *Id.* p. 130-31).

F.     **Procedural History**

On May 5, 2003, Pohoski filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") against the Statesville Shoney's Restaurant, alleging sex discrimination. ( *Id.* Exh. 12). On September 30, 2004, the EEOC filed a Complaint on Pohoski's behalf, asserting claims of hostile work environment and constructive discharge against Defendant.

## II.  STANDARD OF REVIEW

Rule 56(c) of the Federal Rules of Civil Procedure permits the entry of summary

judgment where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *Anderson v. Liberty Lobby*, 477 U.S. 242 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). A genuine issue exists only if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248. But the party opposing summary judgment may not rest upon mere allegations or denials, and a "mere scintilla of evidence" is insufficient to overcome summary judgment. *Id.* at 249-50. Moreover, when the movant supports its motion for summary judgment by affidavits, the adverse party may not rest upon the mere allegations or denials of their pleading, but the adverse party's response must be supported by affidavits or as otherwise provided by Rule 56 and must set forth specific facts showing that there is a genuine issue for trial. FED. R. CIV. P. 56(e).

Courts, in considering motions for summary judgment, view the facts and inferences in the light most favorable to the party opposing the motion. *Anderson*, 477 U.S. at 255; *Miltier v. Beorn*, 896 F.2d 848 (4th Cir. 1990); *Cole v. Cole*, 633 F.2d 1083 (4th Cir. 1980). Summary judgment is thus proper where "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there [being] no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotations omitted).

## III. DISCUSSION

A.    **Sexual Harassment in Violation of Title VII**

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such

individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). Since the working environment is one of the "terms, conditions, or privileges" of employment, Title VII provides a cause of action in favor of individuals who are forced to work in a hostile environment. *Hartsell v. Duplex Prods., Inc.*, 123 F.3d 766, 772 (4th Cir. 1997) (citing *Meritor Savs. Bank v. Vinson*, 477 U.S. 57, 64-67, 106 S.Ct. 2399, 2403-05, 91 L.Ed.2d 49 (1986)). "This provision 'not only covers terms and conditions in the narrow contractual sense, but evinces a congressional intent to strike at the entire spectrum of disparate treatment of men and women in employment.'" *Ocheltree v. Scollon Productions, Inc.*, 335 F.3d 325, 331 (4th Cir. 2003) (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998)). In sum, it is a violation of Title VII "'[w]hen the workplace is permeated with discriminatory [sex-based] intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Ocheltree*, 335 F.3d at 331 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)).

To prevail on a Title VII hostile work environment claim, a plaintiff must establish that the offending conduct was: (1) unwelcome; (2) based on plaintiff's gender; (3) sufficiently pervasive or severe to alter the conditions of employment and to create a hostile work environment; and (4) imputable to the employer. *Matvia v. Bald Head Island Mgmt., Inc.*, 259 F.3d 261, 266 (4th Cir. 2001).[4]

### 1.    Harassment "because of" Pohoski's gender

"Title VII does not prohibit all verbal or physical harassment in the workplace; it is

---

[4]The parties do not dispute that the alleged harassment by Faust Sr. was not welcomed by Pohoski. ( *See* Def. Br. in Supp. of Mot. for Summ. Judgm. pp. 15-22; Pl. Mem. in Opp'n to Def. Mot. for Summ. Judgm. p. 15). Therefore, the Court will presume for purposes of this Motion for Summary Judgment only that Plaintiff has established the first element of its hostile work environment claim.

directed only at '*discriminat[ion]* . . . because of . . . sex.'" *Oncale*, 523 U.S. at 80, 118 S. Ct. at 1002. "'An employee is harassed or otherwise discriminated against 'because of' his or her sex if, 'but-for' the employee's sex, he or she would not have been the victim of the discrimination.'" *Hartsell*, 123 F.3d at 772 (quoting *Wrightson v. Pizza Hut of Am., Inc.*, 99 F.3d 138, 142 (4th Cir. 1996)). Unless the harassment is directed toward an employee "because of" his or her status as a man or woman, it does not implicate Title VII. *Hopkins v. Baltimore Gas & Electric Co.*, 77 F.3d 745, 752 (4th Cir. 1996). Significantly, "[w]hen someone sexually harasses an individual of the opposite gender, a presumption arises that the harassment is 'because of' the victim's gender." *Id.* However, the critical issue in determining whether the harassment was "because of" the plaintiff's gender is "'whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed.'" *Lack v. Wal-Mart Stores, Inc.*, 240 F.3d 255, 261 (4th Cir. 2001) (quoting *Willis v. Wal-Mart Stores, Inc.*, 504 S.E.2d 648, 652 (W. Va. 1998)).

Defendant argues that the majority of the harassment alleged by Plaintiff is sexually neutral or, at most, ambiguous, and therefore cannot give rise to an actionable hostile environment claim because the comments were not directed at Pohoski because of her gender. (Def's. Br. in Supp. of Mot. for Summ. J. pp. 16-18). In response, Plaintiff notes that Faust Senior's conduct toward Pohoski, which included statements such as, "I can't fuck you real good because my dick is only this size, but I can eat your pussy" and "[t]he last time I had a girl your size, she wore the hair off my dick," was clearly sexual in nature. (Pl's. Mem. in Opp'n to Def's. Mot. for Summ. J. p. 15) (citing Pohoski Dep. pp. 175-76, 152-55).

The Court agrees with Plaintiff that, taking the facts in the light most favorable to

Plaintiff, although there were numerous comments made by Faust Senior which were arguably not directed at Pohoski because of her sex, various comments, including those described above, are clearly sexual in nature. Since this conduct involves explicit or implicit proposals of sexual activity, it is reasonable to presume that Faust Senior would not have made those same statements to a male employee.[5] *See Oncale*, 523 U.S. at 80, 118 S.Ct. at 1002 (noting where challenged conduct typically involves explicit or implicit proposals of sexual activity, it is reasonable to assume those proposals would not have been made to someone of the same sex). Moreover, no evidence has been presented that Faust Senior made similar sexual comments to male employees at the Statesville Shoney's. Therefore, the Court finds that Plaintiff has established that at least some of Faust Senior's offensive conduct was directed at Pohoski because of her gender.

2.      **Harassment that is severe or pervasive**

The third element of a hostile work environment claim focuses on whether the harassment was sufficiently severe or pervasive to create an abusive working environment. This element "tests the mettle of most sexual harassment claims." *Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 583 (11th Cir. 2000). Consideration of the severity and pervasiveness of the alleged harassment is essential because "[n]ot all workplace conduct that may be described as 'harassment' affects a 'term, condition, or privilege' of employment within the meaning of Title VII." *Meritor*, 477 U.S. at 67, 106 S.Ct. at 2399. In sum, a plaintiff must show that her workplace was *permeated* with discriminatory intimidation, ridicule, and insult. *Harris*, 510

---

[5]However, the Court notes that the United States Supreme Court has never held that "workplace harassment, even harassment between men and women, is automatically discrimination because of sex merely because the words used have sexual content or connotations." *Oncale*, 523 U.S. at 80, 118 S.Ct. 998.

U.S. at 21, 114 S.Ct. 367 (emphasis added).  Moreover, "[n]ot all sexual harassment that is

directed at an individual because of his or her sex is actionable.  Title VII does not attempt to

'purge the workplace of vulgarity.'" *Hopkins*, 77 F.3d at 753 (quoting *Baskerville v. Culligan

Int'l Co.*, 50 F.3d 428, 430 (7th Cir. 1995)).  Although Title VII provides employees with the right

to work in an environment free from discriminatory intimidation, ridicule, and insult, its

protections "'do not insulate one from either the normal day-to-day dissatisfactions and

annoyances commonly arising in any workplace or from the sometimes unpleasantness of a surly,

strict or even personally insufferable and demanding supervisor.'"  *Meritor*, 477 U.S. at 65, 106

S. Ct. at 2399; *Dachman v. Shalala*, 46 F. Supp. 2d 419, 438 (D. Md. 1999) (quoting *Settle v.

Baltimore County*, 34 F. Supp. 2d 969, 991 (D. Md. 1999)).  "'Simple teasing, offhand

comments, and isolated incidents (unless extremely serious) will not amount to discriminatory

changes in the terms and conditions of employment.'" *Lissau v. Southern Food Serv., Inc.*, 159

F.3d 177, 183 (4th Cir. 1998) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788, 118

S.Ct. 2275, 2283, 141 L.Ed.2d 662 (1998)).  "These standards for judging hostility are

sufficiently demanding to ensure that Title VII does not become a 'general civility code.'"

*Faragher*, 524 U.S. at 788, 118 S.Ct. at 2283-84 (quoting *Oncale*, 523 U.S. at 80, 118 S.Ct. at

1002).  If these standards are properly applied, "they will filter out complaints attacking 'the

ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-

related jokes, and occasional teasing.'" *Faragher*, 524 U.S. at 788, 118 S.Ct. at 2284 (citing B.

LINDEMANN & D. KADUE, *Sexual Harassment in Employment Law* 175 (1992)).

  "In order to clear the high threshold of actionable harm, the conduct in question must (1)

be 'severe or pervasive enough to create an objectively hostile or abusive work environment' and

(2) be subjectively perceived by the victim to be abusive." *EEOC v. R&R Ventures*, 244 F.3d 334, 339 (4th Cir. 2001) (quoting *Harris*, 510 U.S. at 21, 114 S.Ct. 367); *see also Conner v. Schrader-Bridgeport Int'l, Inc.*, 227 F.3d 179, 193 (4th Cir. 2000) (noting that the conduct in question must be judged by both an objective and subjective standard, such that the conduct must be severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive, and the victim must subjectively regard that environment as abusive) (quoting *Harris*, 510 U.S. 21-22, 114 S.Ct. 367). "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment - an environment that a reasonable person would find hostile or abusive - is beyond Title VII's purview. *Harris*, 510 U.S. at 21, 114 S.Ct. at 370. Moreover, if the plaintiff does not subjectively perceive the work environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation. *Id.*, 510 U.S. at 21-22, 114 S. Ct. at 370.

Determining "'the objective severity of harassment' requires consideration of 'all the circumstances,' including 'the social context in which particular behavior occurs and is experienced by its target.'" *R&R Ventures*, 244 F.3d at 340 (quoting *Oncale*, 523 U.S. at 81, 118 S.Ct. 998). "'The real social impact of workplace behavior often depends on a constellation of surrounding circumstances' in order to determine what conduct 'a reasonable person in the plaintiff's position would find severely hostile or abusive.'" *Id.*, 244 F.3d at 340 (quoting *Oncale*, 523 U.S. at 81-82, 118 S.Ct. 998). "The 'line between a merely unpleasant working environment . . . and a hostile or deeply repugnant one' may be difficult to discern." *Hopkins*, 77 F.3d at 753 (quoting *Baskerville*, 50 F.3d at 431). However, in attempting to determine whether a work environment is objectively hostile or abusive, courts consider the following factors: (1) the

frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating, or a mere offensive utterance; (4) whether the conduct unreasonably interfered with the plaintiff's work performance; and (5) what psychological harm, if any, resulted from the harassment. *Conner*, 227 F.3d at 193 (citing *Harris*, 510 U.S. at 23, 114 S.Ct. 367; *Smith v. First Union Nat'l Bank*, 202 F.3d 234, 242 (4th Cir. 2000)).

Relying on various cases within the Fourth Circuit and throughout other jurisdictions, Defendant maintains that the sex-related remarks that Plaintiff attributes to Faust Senior were not severe or pervasive enough to create a hostile environment. (Def's. Br. in Supp. of Mot. for Summ. J. pp. 18-22). Defendant further notes that Faust Senior's alleged harassment of Pohoski was not continuous but, rather, consists of four specific sexual comments made during Pohoski's 12-day tenure at the Statesville Shoney's Restaurant. ( *Id.* p. 3). Defendant concludes that although Faust Senior's alleged sexual remarks may have been offensive, none of the conduct was especially humiliating, it was not physically threatening to Pohoski, and there was no evidence that Faust Senior's conduct unreasonably interfered with Pohoski's work performance. Therefore, Plaintiff has failed to establish a *prima facie* case of a hostile work environment claim and its claims must be dismissed as a matter of law. ( *Id.* p. 11).

In response, Plaintiff cites numerous cases in support of its argument that Faust Senior's conduct toward Pohoski, considering both the sexual and non-sexual comments or conduct as a whole, establishes that his actions were sufficiently severe or pervasive to create an abusive working environment. (Pl's. Mem. in Opp'n to Def. Mot. for Summ. J. pp. 16-19). Plaintiff maintains that Faust Senior's harassment of Pohoski was continuous and included vulgar, sexually-explicit comments and far exceeded merely crass and inappropriate behavior. ( *Id.* p.

19).  Therefore, Plaintiff concludes that a reasonable jury could find that the harassment was sufficiently severe or pervasive to alter Pohoski's work conditions.  (*Id.*).

As described above, Pohoski lists numerous statements made by Faust Senior that were either explicitly sexual in nature or that Pohoski interpreted to be sexual.  However, there are various comments cited by Pohoski that were not related to her gender or sexual in nature.  For example, although Pohoski did not like Faust Senior calling her "Poho," the nickname has not been attributed to any sexual connotation.  Moreover, although Pohoski was uncomfortable when she would emerge from the unisex restroom and find Faust Senior outside the door, or when he would be in Pohoski's area while she cleaned her section of the restaurant, Plaintiff has not established a sexual connotation during these encounters.  Moreover, "[a]lthough following an employee and staring at her can betray romantic or sexual attraction, the everyday observation of fellow employees in the workplace is also a natural and unavoidable occurrence when people work together in close quarters or when a supervisor keeps an eye on employees."  *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1248 (11th Cir. 1999).  Additionally, when Faust Senior told Pohoski that she needed to work more nights if she wanted job security, Pohoski interpreted this comment to mean that she had to have sex with him if she wanted to keep her job.  (Pohoski Dep. pp. 184-85).  However, Plaintiff has presented no evidence that Faust Senior's comment had a sexual connotation.  In fact, the evidence in the case shows that on the day Pohoski quit her job, Faust Senior told her that if she could not ring up orders properly for the kitchen, she would have to go on night shift. (Faust II Dep. pp. 76-77).  Moreover, Richard Santorum advised Pohoski that she would have to go on the night shift for more intensive training.  (Santorum Dep. pp. 27).  Since these allegedly offensive comments are not related to Pohoski's gender, and only

harassment that occurs because of the plaintiff's gender is actionable, these remarks do not create a federal cause of action for sexual harassment. *Hartsell v. Duplex Products, Inc.*, 123 F.3d 766, 772 (4th Cir. 1997).

However, the Court is charged with considering all of the circumstances surrounding the alleged harassment to determine whether Faust Senior's conduct toward Pohoski was sufficiently severe or pervasive to create a hostile work environment. *Harris*, 510 U.S. at 21-23, 114 S.Ct. at 370-71; *see also Shaver v. Dixie Trucking Co., Inc.*, 181 F.3d 90 (4th Cir. 1999) (unpublished) (noting that in determining whether a work environment is objectively hostile or abusive, a court must look at all the circumstances) (citing *Harris*, 510 U.S. at 23). The inquiry into what behavior constitutes a violation of Title VII requires "careful consideration of the social context in which particular behavior occurs and is experienced by its target. . . ." *Oncale*, 523 U.S. 75, 80, 118 S.Ct. 998, 1003, 140 L.Ed.2d 201 (1998). Therefore, the Court will consider the comments cited by Pohoski that were not related to her gender or sexual in nature in conjunction with the sexual comments allegedly made by Faust Senior in determining whether the harassment was severe or pervasive.

With regard to Faust Senior's alleged conduct directed at Pohoski because of her sex, the Court finds that this harassment - even taken in conjunction with the non-sexual comments - does not rise to the level of an actionable hostile work environment claim. Although the Court has no doubt that Pohoski subjectively perceived the alleged harassment to be severe and pervasive, the evidence presented does not support a finding from an objective viewpoint that the alleged harassment was so frequent, severe, or pervasive to constitute actionable sexual harassment under Title VII. In sum, Pohoski alleges that Faust Senior said "Come here, let's talk about sex";

made an unspecified comment about Pohoski's rear end; told Pohoski, "The last time I had a girl your size, she wore the hair off of my dick"; looked at Pohoski's rear end and said "Mmm, mmm, mmm"; and stated to Pohoski, "I can't fuck you real good because my dick is like this size [indicating with fingers], but I can eat your pussy." (Pohoski Dep. pp. 144-46, 149-50, 152-53, 170-72, 175-76).  In addition to these five comments, Pohoski alleges that she heard Faust Senior say, "something to the fact that 'I've got the power and the money to do what I want to do to who I want to do it to.'" ( *Id.* p. 187).  However, Pohoski does not know the context in which Faust Senior made this comment. ( *Id.* p. 189).  Additionally, Pohoski saw Faust Senior approach another server and press the edge of a tray into the server's breasts, but Pohoski does not know what the server and Faust Senior were talking about.[6]  ( *Id.* pp. 158-60).

Although the conduct in this case is inappropriate,  "[t]he real aim of harassment litigation . . . are those situations when an employee is made the unwilling target of repeated, sexually-charged and gender-based remarks, when [she] is threatened with sexual assault, and when [she] is subjected to unwelcome sexual contact." *Lack*, 240 F.3d at 262 (internal quotations omitted).  In fact, courts have found behavior that is even more egregious than that described here insufficient to sustain a hostile work environment claim.  *See, e.g.*, *Shaver*, 181 F.3d 90 (concluding that supervisor placing his hand on plaintiff's knee during her job interview, rubbing plaintiff's back and shoulders and putting his arm around plaintiff several times during her employment did not rise to the level of severe or pervasive conduct); *Shepherd v. Comptroller of Public Accounts of the State of Texas*, 168 F.3d 871 (5th Cir. 1999) (affirming grant of summary

---

[6]In examining the totality of the circumstances, a court can consider conduct that is targeted at another individual other than plaintiff, but the weight of such "second hand harassment" is not as great as any harassment directed at the plaintiff.  *Brown v. Hous. Auth. of Calvert County*, 150 F. Supp. 2d 856, 863 (D. Md. 2001) (citing *McPhaul v. Bd. of Comm'rs of Madison County*, 226 F.3d 558, 567 (7th Cir. 2000)).

judgment for defendant and finding conduct by co-worker, which included a remark that plaintiff's "elbows are the same color as [her] nipples," standing over plaintiff's desk and attempting to look down her clothing, simulating looking under plaintiff's dress and remarking "you have big thighs," touching plaintiff's arm on several occasions, rubbing his hand from plaintiff's shoulder down to her wrist, and on two separate occasions when plaintiff was looking for a chair after coming in late to an office meeting the co-worker patted his lap and remarked "here's your seat," insufficient to establish a hostile work environment); *Indest v. Freeman Decorating, Inc.*, 164 F.3d 258, 264-67 (5th Cir. 1999) (finding it difficult to conclude that several sexually oriented comments and gestures and an implied threat of retaliation for refusing a sexual advance would be sufficient to establish a hostile environment); *Scusa v. Nestle U.S.A. Co., Inc.*, 181 F.3d 958, 966-67 (8th Cir. 1999) (affirming grant of summary judgment for employer where plaintiff alleged that she was ostracized and isolated by other employees and first-line supervisors, various co-workers patted plaintiff on the bottom, blew her kisses, made sexual comments to her, teased her, picked on her, thumped her on the head, made fun of the way that she dressed and ate, called her names and yelled, "You need to get your f story straight; I don't know anything about the f minerals. You girls need to leave me the hell alone," made threatening gestures towards her, and cussed at her); *Mendoza v. Borden, Inc.*, 195 F.3d 1238 (11th Cir. 1999) (finding alleged harassment "falls well short of the level of either severe or pervasive conduct sufficient to alter [the plaintiff's] terms or conditions of employment" where plaintiff presented evidence of supervisor telling plaintiff, "I'm getting fired up"; supervisor rubbed his hip against plaintiff's hip while touching her shoulder and smiling; two instances when the supervisor made a sniffing sound while looking at plaintiff's groin area and one

instance of sniffing without looking at her groin; and supervisor constantly followed and stared at plaintiff in a "very obvious fashion"); *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 768 (2nd Cir. 1998) (finding supervisor's statement that plaintiff had the "sleekest ass" in the office plus single incident of "deliberately" touching plaintiff's "breasts with some papers that he was holding in his hand" were insufficient to constitute severe or pervasive actions that altered the terms or conditions of the plaintiff's employment); *Adusumilli v. City of Chicago*, 164 F.3d 353, 361-62 (7th Cir. 1998) (concluding actions insufficient to support hostile environment claim where co-employees teased plaintiff, made sexual jokes aimed at her, asked her what "putting one rubber band on top and another on the bottom means," commented about her low neck tops, repeatedly stared at her breasts with attempts to make eye contact, and four incidents of touching her arm, fingers or buttocks); *Sprague v. Thorn Americas, Inc.*, 129 F.3d 1355, 1365-66 (10th Cir. 1997) (finding five sexually-oriented, offensive statements over sixteen months insufficient to show hostile environment, even though one comment by the harasser occurred while he put his arm around plaintiff, looked down her dress and said, "well, you got to get it when you can"); *Black v. Zaring Homes, Inc.*, 104 F.3d 822, 823-24, 826-27 (6th Cir. 1997) (reversing jury verdict and finding although conduct was "sex-based" it was insufficiently severe or pervasive to state actionable hostile environment claim where conduct over a four-month period involved repeated sexual jokes; one occasion of looking plaintiff up and down, smiling and stating, "there's nothing I like more in the morning than sticky buns"; suggesting land located near a Hooters Restaurant be named "Titsville" or "Twin Peaks"; asking plaintiff, "say, weren't you there [at a biker bar] Saturday night dancing on the tables?"; stating, "just get the broad to sign it"; telling plaintiff she was "paid great money for a woman"; and laughing when plaintiff mentioned the name of Dr.

Paul Busam, apparently pronounced as "bosom"); *Hopkins*, 77 F.3d 745 (finding supervisor's alleged harassment of employee was not sufficiently severe or pervasive to create objectively hostile work environment where supervisor, in addition to other conduct and statements, attempted to kiss plaintiff in the receiving line at plaintiff's wedding, positioned a magnifying glass over plaintiff's crotch and asked, "Where is it?", pretended to lock the door to the bathroom and said "Ah, alone at last" to plaintiff, regularly commented on plaintiff's appearance by saying, "you look nice today" or "you have a really pretty shirt on", and during a group conversation the supervisor stated that in order to survive with burning fuel on the surface of the water he would "find a dead man and cut of his penis and breathe through that"); *Baskerville*, 50 F.3d at 430-31 (concluding actions not sufficiently severe or pervasive to support a hostile-environment claim where plaintiff alleged nine instances of offensive behavior over seven months including repeated references to plaintiff as a "tilly" and a "pretty girl" and one instance of simulated masturbation); *Weiss v. Coca-Cola Bottling Co. of Chicago*, 990 F.2d 333, 337 (7th Cir. 1993) (granting summary judgment for defendant on plaintiff's sexual harassment claim where supervisor repeatedly asked plaintiff about her personal life, told plaintiff how beautiful she was, asked plaintiff on dates, called her a dumb blonde, put his hand on her shoulder at least six times, placed "I love you" signs in her work area, and tried to kiss her once at a bar and twice at work); *Murray v. City of Winston-Salem, North Carolina*, 203 F. Supp. 2d 493, 498-99 (M.D.N.C. 2002) (finding no objectively hostile work environment where the supervisor yelled at plaintiff during meetings and had an intimidating management style, gave preferential treatment to an alleged paramour, made comments about his past sexual encounters and rotated his pelvis, kissed paramour in front of plaintiff on two occasions, put his arm around plaintiff after a meeting in

which plaintiff cried, made a comment about how plaintiff looked in jeans, briefly touched plaintiff's thigh twice with his thumb during a crowded meeting, and made "ummm" noises and stared at plaintiff when she walked past him).[7]

The Court notes that although the alleged comments by Faust Senior were inappropriate, and may have occurred with some regularity during Pohoski's twelve day tenure at the Statesville Shoney's, they were not severe, nor were they physically threatening to Pohoski. Each comment made by Faust Senior is equivalent to a mere utterance of an epithet that engenders offensive feelings. *See Shepherd*, 168 F.3d at 874 (citing *Harris*, 510 U.S. at 21, 114 S.Ct. at 370). Additionally, Faust Senior's conduct did not interfere with Plaintiff's work performance, as evidenced by the fact that on the day that she resigned, Pohoski stated that she "didn't want to lose [her] job and [she] liked working at Shoney's before, and [she] planned on staying there." (Pohoski Dep. p. 114). Moreover, there is no evidence that Pohoski was unable to work her full shifts or to perform all of her duties. In sum, even taking all allegations in the light most favorable to Plaintiff, the Court finds that Faust Senior's conduct was not severe or pervasive enough to create an objectively hostile work environment.

However, even if the Court were to find that the alleged harassment was sufficiently severe or pervasive to alter the conditions of Pohoski's employment, Defendant may not be held liable for the alleged sexual harassment.

### 3.      Imputing liability to the employer

It is a longstanding principle that employers are not always automatically liable for sexual

---

[7]Although the findings of other jurisdictions are not binding on this Court, they are persuasive in demonstrating what actions other courts have found to be insufficient for a plaintiff to maintain a Title VII hostile work environment claim.

harassment engaged in by their supervisors. *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 186 (4ᵗʰ Cir. 2001) (citing *Meritor Sav. Bank, FSB v. Vinson*, 77 U.S. 57, 72, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)); *Lissau v. Southern Food Serv., Inc.*, 159 F.3d 177, 1818 (4ᵗʰ Cir. 1998). Rather, there must be a basis in law for imputing the acts of the supervisor to the employer. *Spriggs*, 242 F.3d at 186.

a. ***Supervisor acting as proxy or alter-ego of defendant***

Plaintiff here argues that liability for Faust Senior's alleged harassment may be imputed to Defendant based on the "alter ego" or "proxy" theory. (Pl. Mem. in Opp'n to Def.'s Mot. for Summ. Judgm. pp. 19-22). Citing cases from the Fifth, Seventh, Eighth, Tenth, and Eleventh Circuits, Plaintiff argues that "[a]n employer is vicariously liable for the acts of those who can be considered an alter ego or proxy of the employer, such as 'a president, <u>owner</u>, proprietor, partner, corporate officer, or supervisor hold[ing] a sufficiently high position in the management hierarchy of the company for his actions to be imputed automatically to the employer.'" (*Id.* p. 20) (quoting *Johnson v. West*, 218 F.3d 725, 730 (7ᵗʰ Cir. 2000)).

This Court disagrees with Plaintiff that the "alter ego" or "proxy" theory is an additional exception to the *Faragher/Ellerth* affirmative defense. First, the Court can find no cases in the Fourth Circuit which have adopted this theory. Second, although the *Faragher* Court commented on the proxy doctrine, this reference was limited to a historical context and was not mentioned within the holding of the *Faragher* decision. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 789, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). In fact, the Supreme Court clearly held that the only occasion when an employer may automatically be held liable for harassment by a supervisor with immediate (or successively higher) authority over the employee is where a

25

tangible employment action has been taken. *Faragher*, 524 U.S. at 807, *Ellerth*, 524 U.S. at 765. If the proxy or alter-ego theory created another basis for holding employers automatically liable, this Court presumes that the Supreme Court would have discussed such exception in the *Faragher* holding. It did not. *Faragher*, 524 U.S. at 807-08. Therefore, the Court will not apply such exception to the case at bar.

        **b.**      ***Tangible employment action***

The only occasion when an employer may be held automatically liable for the harassment by a supervisor is when, as a result of the prohibited discrimination, an employee suffers a tangible employment action at the hands of her supervisor. *Spriggs*, 242 F.3d at 186 (citing *Burlington Indus. v. Ellerth*, 524 U.S. 742, 762-63, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998)).

A tangible employment action is a significant change in employment status, such as hiring, firing, failure to promote, reassignment with significantly different responsibilities, demotion, or a decision that causes a substantial change in benefits. *Ellerth*, 524 U.S. at 761; *Matvia v. Bald Head Island Mgmt., Inc.*, 259 F.3d 261, 266 (4th Cir. 2001); *see also Brown v. Perry*, 184 F.3d 388, 394 (4th Cir. 1999) (citing *Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998); *Faragher*, 118 S.Ct. at 2293) (noting when sexual harassment by a supervisor takes the form of a "tangible employment action," such as discharge, demotion, or undesirable reassignment, against a subordinate, vicarious liability will be imposed against the employer). In sum, tangible employment actions "are the means by which the supervisor brings the official power of the enterprise to bear on subordinates." *Spriggs*, 242 F.3d at 186 (citing *Ellerth*, 524 U.S. at 762). Therefore, a tangible employment action taken by a supervisor becomes, for purposes of Title VII, the act of the employer. *Spriggs*, 242 F.3d at 186. In the

instant case, Plaintiff does not allege that Pohoski was subjected to a tangible employment action by Faust Senior. (Pl. Mem. in Opp'n to Def.'s Mot. for Summ. Judgm. pp. 19-22). There is no evidence that Pohoski was fired, demoted, reassigned, or suffered a loss of pay or benefits. Although Plaintiff alleges that she was constructively discharged, she does not claim that such discharge was predicated on any official employment action by Defendant. *See Pennsylvania State Police v. Suders*, 542 U.S. 129, 148-49, 124 S.Ct. 2342 (2004) (finding that where an official act does not underlie the constructive discharge, the employer is entitled to application of the *Faragher/Ellerth* affirmative defense). In fact, on the day that Pohoski resigned, she "didn't want to lose [her] job and [she] liked working at Shoney's before, and [she] planned on staying there." (Pohoski Dep. p. 114). It wasn't until she was reprimanded for talking to a co-worker and Faust Senior then later said to the servers, "you fucking bitches, get this GD [or God-damned] food out of the window" that Pohoski "had all [she] could take." (Pohoski Dep. pp. 119-24). Therefore, since there was no tangible employment action taken, nor was Pohoski's resignation predicated on an official action of Defendant, Defendant is entitled to employ the *Faragher/Ellerth* affirmative defense against Plaintiff's Title VII claim.[8]

> ### c.    *Faragher/Ellerth defense*

When no tangible employment action is taken by a supervisor, the employer may raise an affirmative defense to liability by proving by a preponderance of the evidence two elements. *Brown*, 184 F.3d at 395 (quoting *Faragher*, 118 S.Ct. at 2293; *Burlington*, 118 S.Ct. at 2270). First, the employer must prove that it "'exercised reasonable care to prevent and correct promptly

---

[8]Even if constructive discharge were determined to be a tangible employment action, as discussed below, Pohoski was not constructively discharged from her job with Defendant. ( *See* infra Section II.B.). Therefore, Pohoski was not subjected to a tangible employment action and Defendant is entitled to application of the *Faragher/Ellerth* affirmative defense.

any sexually harassing behavior.'" *Brown*, 184 F.3d at 395 (quoting *Faragher*, 118 S.Ct. at 2293;

*Burlington*, 118 S.Ct. at 2270). Second, the employer must also demonstrate "'that the plaintiff

employee unreasonably failed to take advantage of any preventive or corrective opportunities

provided by the employer or to avoid harm otherwise.'" *Id.* (quoting *Faragher*, 118 S.Ct. at

2293; *Burlington*, 118 S.Ct. at 2270).

### i. Exercise of reasonable care to prevent sexually harassing conduct

An employer's institution and enforcement of an anti-harassment policy and adequate

complaint procedure, although not required as a matter of law, is certainly relevant in

establishing this first element of the affirmative defense. *Brown*, 184 F.3d at 388 (citing

*Faragher*, 118 S.Ct. at 2293; *Burlington*, 118 S.Ct. at 2270); *see also Matvia*, 259 F.3d at 268

(noting that the courts have found that "dissemination of 'an effective anti-harassment policy

provides compelling proof' that an employer has exercised reasonable care to prevent and correct

sexual harassment'") (quoting *Lissau*, 159 F.3d at 182). However, evidence showing that the

employer implemented a policy in bad faith or was deficient in enforcing the policy will rebut

this proof. *Matvia*, 259 F.3d at 268 (citing *Brown*, 184 F.3d at 396).

In the instant case, Plaintiff argues that Defendant's written policy does not provide an

effective means for employees to report harassment. (Pl. Mem. in Opp'n to Def. Mot. for Summ.

Judgm. p. 23). Plaintiff maintains that employees are instructed to contact a single individual,

Denise Carman, at a phone number that is manned only Monday through Friday, 8:30 a.m. to 5

p.m. (*Id.*) (citing 30(b)(6) Dep. p. 120; Exh. 4). Plaintiff contends that employees are not

provided with a copy of the sexual harassment policy for their files and the only place where a

28

copy of the policy is available to employees is on a bulletin board located in the break room of the restaurant. (*Id.*). With regard to the sexual harassment videos, Plaintiff contends that none of the videos provide contact information for making a complaint to Defendant and the video does not make reference to Defendant Bud Foods or to Defendant's sexual harassment policy. (*Id.* p. 24) (citations omitted).

Despite Plaintiff's contentions, it is undisputed that in March 2003, when Pohoski was hired as a server at the Statesville Shoney's Restaurant, the Company had an established Sexual Harassment Policy in place. (Pohoski Dep. p. 52). In fact, Pohoski signed the Sexual Harassment Policy, indicating that she had "read and underst[ood] the Sexual Harassment policy and agree[d] to comply fully with this policy." (*Id.* p. 55, Exh. 4).

Bud Food's Sexual Harassment Policy clearly provides that Defendant strongly opposes and prohibits sexual harassment of its employees, as well as explaining what types of actions constitute sexual harassment. (*Id.* Exh. 4). Moreover, the Policy provides a means by which employees can report any sexually harassing behavior. Specifically, Defendant's policy provides:

> *Any employee who believes that he or she is the victim of sexual harassment should bring this fact to the attention of Denise Carman (telephone number: 704-527-1745). Denise Carman or her designee, will assist the employee in preparing a written statement of facts which will be the basis for an investigation of the alleged harassment, on a confidential basis. . . .*

(*Id.*). Additionally, Defendant's policy contains a non-retaliation provision, reassuring employees that they can report complaints of harassment and/or discrimination without fear of retaliation. (*Id.*).

In addition to signing an acknowledgment that she reviewed Bud Foods' Sexual

Harassment Policy, Pohoski admits that she was required to watch a series of videos during her orientation, which included information regarding the Company's prohibition against sexual harassment. (*Id.* p. 56). Notably, Pohoski further stated that from watching the video, she understood that Shoney's was saying that sexual harassment was not tolerated in their stores and that employees were encouraged to complain about sexual harassment if it occurred. (*Id.* p. 57).

Plaintiff has provided *no* evidence that Defendant implemented its Sexual Harassment Policy in bad faith or was deficient in enforcing the Policy. Although Plaintiff claims that the Policy does not have an effective complaint mechanism, the Policy clearly instructs employees to report any harassment to Carman and provides her telephone number. However, Plaintiff never attempted to call Carman or anyone else at the corporate office number. (*Id.* pp. 202-05). Moreover, Plaintiff's allegation that Defendant's Policy was ineffective because employees were not given a copy to keep for their records is meritless. First, there is no evidence that Pohoski ever asked for a copy of the Policy. Second, the Policy was conspicuously posed on the bulletin board in the break room at the Statesville Shoney's Restaurant. (Santorum Dep. pp. 21-22; 30(b)(6) Dep. pp. 56, 61-63, 165). Although Plaintiff contends there is no evidence that the policy was posted throughout Pohoski's employment at the Statesville Shoney's, Faust Junior testified that he personally checked the bulletin boards when he visited the restaurants to make sure that the Sexual Harassment Policy and other required notices were posted. (30(b)(6) Dep. pp. 94-95). Moreover, Plaintiff has provided no evidence that the policy was not posted during Pohoski's tenure at the Statesville Shoney's Restaurant.

Additionally, the Policy provides that reports of sexual harassment be made to Denise Carman, so that the alleged victim does not have to report the harassing conduct to someone in

her chain of command. *See Watkins v. Professional Security Bureau, Ltd.*, 201 F.3d 439, 1999 WL 1032614 (4th Cir. Nov. 15, 1999) (unpublished) (finding sexual harassment policy sufficiently evidenced defendant reasonably prevented and corrected promptly sexually harassing behavior where the policy provided that reports of sexual harassment were to be made to the human resources department) (citing *Shaw v. AutoZone, Inc.*, 180 F.3d 806, 811-12 (7th Cir. 1999)).

In sum, in light of the promulgation of Defendant's Sexual Harassment Policy, which provides for a victim of sexual harassment to report such allegations to someone outside the victim's chain of command, and Pohoski's admission that she signed the Policy acknowledgment form, watched the videos, understood that Shoney's was saying that sexual harassment was not tolerated in their stores and that employees were encouraged to complain about sexual harassment if it occurred, the Court finds that Defendant's exercised reasonable care to prevent sexually harassing behavior.

**ii.      Exercise of reasonable care to correct promptly sexually harassing conduct**

As far as correction of sexually harassing behavior, Plaintiff claims that Defendant's failure to take action with regard to two other complaints of sexual harassment demonstrates that Defendant failed to reasonably correct sexual harassment. (Pl. Mem. in Opp'n to Def. Mot. for Summ. Judgm. p. 25).  However, neither of these complaints involved alleged sexual harassment by Faust Senior.  (Faust Jr. Dep. pp. 40-42; Faust Sr. Dep. pp. 46-49).  Moreover, there is no evidence that Pohoski was aware of these complaints of sexual harassment or Defendant's handling of the complaints, nor is there any allegation that Pohoski's failure to report the alleged

harassment resulted from these other allegations of sexual harassment. In fact, as a result of Defendant's training on sexual harassment, Pohoski understood that Shoney's did not tolerate sexual harassment in its stores and that employees were encouraged to complain about sexual harassment if it occurred. (Pohoski Dep. p. 57).

Despite Pohoski's knowledge that Defendant does not tolerate sexual harassment, Pohoski did not attempt to use the complaint procedure set out in Defendant's Sexual Harassment Policy. (Pohoski Dep. pp. 205; Carman Dep. p. 19-20; 30(b)(6) Dep. p. 120-21). Pohoski did report to David Hodge, a manager trainee, some of the sexual comments that Faust Senior had made to her. (Pohoski Dep. pp. 200-01). Pohoski felt she could talk to Hodge because "he was just a manager; he wasn't related or any part of the business." (Pohoski Dep. p. 200). However, a manager in training is not considered a manager, and their managerial responsibilities are generally limited to unlocking the door to the restaurant, putting money in the register, creating a prep list, and taking inventory. (Faust II Dep. pp. 45-46). As manager trainee, Hodge assisted in cooking the food and counted the money in the morning. (Hodge Dep. p. 10). Specifically with regard to Hodge, as a manager trainee, he did not have the ability to hire, fire or discipline employees, he could not grant time off to employees, and he did not make out employee schedules. (*Id.* pp. 41-42). Since Pohoski did not report the alleged sexual harassment pursuant to Defendant's Sexual Harassment Policy, Defendant cannot be considered to have notice of the alleged harassment by Faust Senior and, therefore, did not have an opportunity to correct the alleged harassment. *See Madray v. Publix Supermarkets, Inc.*, 208 F.3d 1290, 1300 (11th Cir. 2000) (concluding that defendant cannot be considered to be on notice of the harassing behavior by plaintiffs' informal complaints to individuals not designated by

defendant to receive or process sexual harassment complaints, and noting that "once an employer has promulgated an effective anti-harassment policy and disseminated that policy and associated procedures to its employees, then 'it is incumbent upon the employees to utilize the procedural mechanisms established by the company specifically to address problems and grievances'") (quoting *Farley v. American Cast Iron Pipe*, 115 F.3d 1548, 1554 (11th Cir. 1997)). In sum, Defendant did not have adequate notice of Faust Senior's alleged harassing behavior through Pohoski's complaint to a manager trainee, and did not know about the alleged harassment by Faust Senior until Pohoski filed her complaint with the EEOC, at which time Pohoski was no longer employed by Defendant. Therefore, Defendant did not violate its duty to correct promptly any sexually harassing behavior by Faust Senior.

### iii. Failure to take advantage of preventive or corrective opportunities

In addition to establishing that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, the employer must also demonstrate "'that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.'" *Brown*, 184 F.3d at 395 (quoting *Faragher*, 118 S.Ct. at 2293; *Burlington*, 118 S.Ct. at 2270). Proof that a plaintiff employee failed to follow a complaint procedure will generally suffice to satisfy the employer's burden under this second element of the affirmative defense. *Id.* (citing *Faragher*, 118 S.Ct. at 2293; *Burlington*, 118 S.Ct. at 2270). "'[T]he law against sexual harassment is not self-enforcing and an employer cannot be expected to correct harassment unless the employee makes a concerted effort to inform the employer that a problem exists.'" *Barrett v. Applied Radiant*

*Energy Corp.*, 240 F.3d 262, 268 (4th Cir. 2001) (quoting *Shaw v. AutoZone, Inc.*, 180 F.3d 806, 813 (7th Cir. 1999)).  In sum, "[t]he law requires an employer to be reasonable, not clairvoyant or omnipotent."  *Brown*, 184 F.3d at 396.

Here, it is undisputed that Pohoski failed to adhere to the complaint procedure provided in Defendant's Sexual Harassment Policy.  However, about a week into her employment, Pohoski told Hodge, the manager trainee, some of the sexual comments that Faust Senior had made to her.  (Pohoski Dep. pp. 200-01).  Pohoski told Hodge that she did not appreciate Faust Senior calling her "Poho" all the time and that other people were complaining about sexual comments being made to them by Faust Senior (*Id.*).  Pohoski felt she could talk to Hodge because "he was just a manager; he wasn't related or any part of the business." (*Id.* p. 200). When Pohoski asked Hodge what she could do about Faust Senior, Hodge told her, "You know, that's a pretty hard thing to do.  You pretty much have to have a witness to be able to do anything like that."  (Hodge Dep. p. 28).  Hodge does not recall reporting Pohoski's complaints to anyone else at Bud Foods. (*Id.*).  Moreover, Hodge was the only individual to whom Pohoski complained about Faust Senior's alleged sexual harassment. (Pohoski Dep. p. 205).

Plaintiff contends that since Pohoski reported Faust Senior's harassment to Hodge, this demonstrates that Pohoski took advantage of Defendant's preventive and corrective measures. (Pl. Mem. in Opp'n to Def. Mot. for Summ. Judgm. pp. 25-27).  In response, Defendant argues that Hodge was not a management-level employee but, rather, Santorum was acting as the restaurant's general manager at the time that Pohoski made her complaint about Faust Senior. (Def's. Reply Br. p. 26).  Moreover, Defendant notes that Pohoski's mistaken belief that Hodge was a manager does not excuse her failure to use Defendant's established complaint mechanisms

outlined in its Sexual Harassment Policy and its videos. (*Id.* pp. 26-27).

Although Pohoski reported the alleged harassment to Hodge, she did so because Hodge "wasn't related or any part of the business." (Pohoski Dep. p. 200). However, the Sexual Harassment Policy provided a means by which Pohoski could report the alleged harassment and bypass Faust Senior. Even if Pohoski knew that Carman had an ownership interest in the restaurant, Pohoski's fear of retaliation does not excuse her failure to follow the complaint procedures in the Policy. *See Barrett v. Applied Radiant Energy Corp.*, 240 F.3d 262, 267 (4th Cir. 2001) (noting that "[a] generalized fear of retaliation does not excuse a failure to report sexual harassment. Instead, the law is specifically designed to encourage harassed employees to turn in their harasser because doing so inures to everyone's benefit"). In fact, "the reporting requirement serves the 'primary objective' of Title VII which 'is not to provide redress but to avoid harm.'" *Barrett*, 240 F.3d at 267 (quoting *Faragher*, 524 U.S. at 806). Consequently, the courts have found that the reporting requirement is so essential to the law of sexual harassment that they have "refused to recognize a nebulous fear of retaliation as a basis for remaining silent." *Barrett*, 240 F.3d at 267.

In sum, "any evidence that the plaintiff failed to utilize the company's complaint procedure 'will normally suffice to satisfy [the company's] burden under the second element of the defense.'" *Barrett*, 240 F.3d at 267 (quoting *Lissau*, 159 F.3d at 182). Here, Pohoski was directed to call Carman at the telephone number listed in the Policy. (Pohoski Dep. Exh. 4). Complaining to a manager trainee was not listed as a means for reporting allegations of sexual harassment. Therefore, it is undisputed that Pohoski failed to use Defendant's complaint procedure and, thus, unreasonably failed to take advantage of the preventive or corrective

opportunities provided by Defendant or to avoid harm otherwise.

Since Defendant is entitled to application of the *Faragher/Ellerth* defense and has established that it exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and that Pohoski unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise, Defendant is entitled to summary judgment on Plaintiff's Title VII claim.

**B.     Constructive Discharge**

Defendant also seeks summary judgment on Plaintiff's constructive discharge claim. Defendant contends that the record evidence does not suggest that Bud Foods deliberately subjected Pohoski to such an intolerable sexually hostile work environment that a reasonable person would have felt compelled to resign. (Def. Br. in Supp. of Mot. for Summ. Judgm. pp. 23-24). In response, Plaintiff maintains that the harassment perpetrated by Faust Senior, an owner of the company and the father of the two majority shareholders, should be sufficient evidence of conditions that were so intolerable that a reasonable person would have felt compelled to resign. (Pl. Mem. in Opp'n to Def. Mot. for Summ. Judgm. p. 28). Plaintiff admits that even several hours prior to Pohoski's resignation, she did not want to lose her job. (*Id.*) (citing Pohoski Dep. pp. 113-14). Plaintiff contends, however, that when Faust Senior yelled at the waitresses, "You fucking bitches, get this GD [or God Damned] food out of the window," Pohoski realized the situation was hopeless and, as any reasonable person would have done, Pohoski resigned. (*Id.*)

Even in the absence of formal discharge by his employer, an employee is entitled to relief if the employer deliberately made the working conditions intolerable in an effort to induce the employee to quit. *Honor v. Booz-Allen & Hamilton, Inc.*, 383 F.3d 180, 186 (4th Cir. 2004)

(quoting *Martin v. Cavalier Hotel Corp.*, 48 F.3d 1343, 1353-54 (4th Cir. 1995)).  "The doctrine of constructive discharge protects an employee 'from a calculated effort to pressure him [or her] into resignation through the imposition of unreasonably harsh conditions, in excess of those faced by his [or her] co-workers.'" *Lowe v. Unifi, Inc.*, 292 F. Supp. 2d 773, 787 (M.D.N.C. 2003) (quoting *Carter v. Ball*, 33 F.3d 450, 459 (4th Cir. 1994)).  However, "[a]n employee may not be unreasonably sensitive to his working environment."  *Honor*, 383 F.3d at 187 (citing *Goldsmith v. Mayor and City Council of Baltimore*, 987 F.2d 1064, 1072 (4th Cir. 1993)).  Therefore, a claim of constructive discharge is not governed by an employee's subjective perceptions.  *Id.*  Inherent in every job are frustrations, challenges and disappointments.  *Id.*  Although an employee is protected from a calculated effort to pressure him into resignation through the imposition of unreasonably harsh conditions, in excess of those faced by his co-workers, he is not guaranteed a working environment free of stress.  *Id.*  "'Because the claim of constructive discharge is so open to abuse by those who leave employment of their own accord, this Circuit has insisted that it be carefully cabined.'" *Id.* (quoting *Paroline v. Unisys Corp.*, 879 F.2d 100, 114 (4th Cir. 1989)).

To establish constructive discharge, a plaintiff must allege and prove: (1) deliberateness of the employer's actions; and (2) the objective intolerability of the working conditions.  *Id.* (citing *Matvia*, 259 F.3d at 273; *Brown v. Eckerd Drugs, Inc.*, 663 F.2d 1268, 1272 (4th Cir. 1981), *judgment vacated on other grounds*, 457 U.S. 1128, 102 S.Ct. 2952, 73 L.Ed.2d 1345 (1982)); *see also Lowe*, 292 F. Supp. 2d at 787.

An employer acts deliberately when he intends his actions to force an employee to quit. *Jenkins v. City of Charlotte*, No. Civ. A. 3:03CV44, 2005 WL 1861728 at *10 (W.D.N.C. July

37

26, 2005) (unpublished) (citing *Martin v. Cavalier Hotel Corp.*, 48 F.3d 1343, 1354 (4th Cir. 1995)). "'Deliberateness exists only if the actions complained of were intended by the employer as an effort to force the employee to quit.'" *Lowe*, 292 F. Supp. 2d at 787 (quoting *EEOC v. Clay Printing Co.*, 955 F.2d 936, 944 (4th Cir. 1992)). A plaintiff can prove the deliberateness of her employer's actions by establishing "'actual evidence of intent by the employer to drive the employee from a job, or circumstantial evidence of such intent, including a series of actions that single out a plaintiff for differential treatment.'" *Id.* (quoting *Johnson v. Shalala*, 991 F.2d 126, 131 (4th Cir. 1993)). Additionally, "[a] plaintiff may demonstrate deliberate conduct by showing that the employer 'failed to act in the face of known intolerable conditions.'" *Jenkins*, 2005 WL 1861728 at *10 (quoting *Martin*, 48 F.3d at 1354).

In assessing whether working conditions were intolerable, courts consider an objective standard of whether a reasonable person would have felt compelled to resign. *Pennsylvania State Police v. Suders*, 542 U.S. 129, 147, 124 S.Ct. 2342, 2354, 159 L.Ed.2d 204 (2004); *Jenkins*, 2005 WL 1861728 at *10 (quoting *EEOC v. Clay Printing Co.*, 955 F.2d 936, 44 (4th Cir. 1992)). "'However, mere dissatisfaction with work assignments, a feeling of being unfairly criticized, or difficult or unpleasant working conditions are not so intolerable as to compel a reasonable person to resign.'" *Love v. Potter*, No. Civ. 1:03CV00746, 2006 WL 519684 at *8 (M.D.N.C. March 1, 2006) (quoting *James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 378 (4th Cir. 2004)).

In the instant case, there is no evidence that Defendant intended to force Pohoski to quit or that Defendant made Pohoski's working conditions so intolerable that a reasonable person would have felt compelled to resign. In fact, on April 1, 2003, the day Pohoski quit her job at the Statesville Shoney's, Pohoski had no intention of leaving her position at Shoney's, thus

38

evidencing that the alleged sexual harassment by Faust Senior was unrelated to Pohoski's resignation on April 1, 2003.[9] Notably, Pohoski testified that on April 1, 2003, even after she was denied leave to go to the doctor for her injuries, she "didn't want to lose [her] job and [she] liked working at Shoney's before, and [she] planned on staying there." (Pohoski Dep. p. 114). It wasn't until after Faust Senior admonished her for talking to a co-worker and then later saying, "you fucking bitches, get this GD [or God-damned] food out of the window" that Pohoski "had all [she] could take." (*Id.* pp. 119-24). Although these actions by Faust Senior may constitute unpleasant working conditions, these incidents do not establish the objectively intolerable working conditions necessary to prove a constructive discharge. *See Williams v. Giant Food, Inc.*, 370 F.3d 423, 434 (4th Cir. 2004) (finding no constructive discharge where plaintiff alleged that her supervisors yelled at her, told her she was a poor manager and gave her poor evaluations, chastised her in front of customers, and required her to work with an injured back). Therefore, the Court will grant Defendant's Motion for Summary Judgment on Plaintiff's constructive discharge claim.

---

[9]Citing a Seventh Circuit Court of Appeals Case, Plaintiff argues that Pohoski was required to remain on her job while seeking redress, unless conditions were beyond "ordinary discrimination." (Pl. Mem. in Opp'n to Def. Mot. for Summ. Judgm. pp. 27-28 (citing *Perry v. Harris Chernin, Inc.*, 26 F.3d 1010, 1015 (7th Cir. 1997)). Significantly, in *Perry*, plaintiff alleged that during her 14-month tenure, she was subjected to sexually harassing remarks from her supervisor on a daily basis, including comments such as, "You know you want me, don't you?"; "By the way, in your interview, I saw your breasts. I saw your nipples . . . you wore a low-cut blouse, and I could see your breasts, and I knew your nipples were hard."; "[I would] beat [her] with the stick [her] husband used."; and "If you had woke up with me in your bed this morning, you would be smiling right now. The *Perry* court noted that the plaintiff never bothered to read the sexual harassment policy provided by the employer and did not resign until after she was reprimanded for chewing gum and receiving a personal phone call at work. Finding that the plaintiff had options other than quitting, the *Perry* court concluded that the district court properly granted judgment as a matter of law for defendant on plaintiff's claims of sexual harassment and constructive discharge. *Perry*, 126 F.3d at 1015. In the instant case, despite Plaintiff's reliance on *Perry*, there is no evidence that Pohoski's employment with Defendant involved extraordinary conditions. In sum, Plaintiff has failed to show that Pohoski's circumstances at Shoney's were sufficient to justify her decision to quit and sue Defendant, instead of attempting to use the complaint procedures outlined in Defendant's Sexual Harassment Policy.

### III.  CONCLUSION

**IT IS, THEREFORE, ORDERED** that Defendant's Motion for Summary Judgment is hereby **GRANTED**.

Signed: August 7, 2006

Richard L. Voorhees
United States District Judge